[EDITORS' NOTE: THIS PAGE CONTAINED HEAHNOTES AND HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 285 
Leroy Harris, Esther E. Harris, Phillip W. Lovell, Leah C. Lovell ("the Harris-Lovell group") and Steven Shelton and Julie Stapp Shelton ("the Sheltons") were coguarantors of several loans owed by The Milling Company Enterprises, Inc. ("the Milling Company") to First Commercial Bank ("the Bank"). The Harris-Lovell group sued the Sheltons, seeking contribution for the payment of the debt owed by the Milling Company and guaranteed by the Harris-Lovell group and the Sheltons. The Sheltons filed a motion for a summary judgment, arguing that the Harris-Lovell group had waived their right to contribution. The trial court entered a summary judgment in favor of the Sheltons. The Court of Civil Appeals affirmed the summary judgment. Harris v. Shelton, 837 So.2d 276 (Ala.Civ.App. 2001).
This Court granted certiorari review to determine: 1) whether the right of contribution between guarantors may be waived by separate agreements between the lender and the principal debtor, in the absence of a single agreement to which all guarantors are signatories, by application of the integration rule, 2) if the integration rule does apply, whether the Court of Civil Appeals erred in rejecting antecedent oral understandings as sufficient to establish an intent contrary to an intent to apply the rule of integration, and 3) whether the waiver provision in one of the guaranty agreements was ambiguous. We hold that the integration rule can operate so as to bind coguarantors pursuant to separately executed agreements dealing with their rights of contribution, that on the facts here presented parol evidence is necessary to determine whether the integration rule applies, and that the waiver provision in the July 9, 1997, guaranty agreements is ambiguous. We reverse and remand.
 I. Facts
The Harris-Lovell group and the Sheltons were involved in the operation of a restaurant in Huntsville known as "The Mill." The Mill was owned by the Milling Company. The Harris-Lovell group and the Sheltons provided the initial capital to the Milling Company to purchase, renovate, and operate the restaurant. Because the initial capital was insufficient to sustain The Mill's daily operations, the Milling Company periodically borrowed money from the Bank.
As a condition of the loans, the Bank required the Harris-Lovell group and the Sheltons to guarantee 50% of the total amount of the loans to the Milling Company. The parties were asked to sign individual guaranty agreements, and Esther Harris (a member of the Harris-Lovell group) expressed concerns about agreeing to be personally liable for 50% of the face value of the loans in light of the fact that she did not have a 50% ownership interest in the Milling Company. Harris expressed those concerns during a meeting between *Page 286 
the Harris-Lovell group and the Sheltons before they signed the individual guaranty agreements. According to Harris, Steven Shelton told her "not to worry, that [she] would never have to pay or be responsible for these loans and if [they] have to pay, then [they] would each be responsible one third [the Lovells], one-third [the Harrises], and one-third [the Sheltons]." According to Esther Harris, each of the parties agreed with Shelton's statement.
From March 3, 1997, to February 3, 1999, the Harrises, the Lovells, and the Sheltons each signed five individual guaranty agreements with the Bank, each evidencing a new loan. All of the agreements, with the exception of the guaranty agreements dated July 9, 1997, contained the following provision:
 "10. The Undersigned waives any claim, remedy or other right which the Undersigned may now have or hereafter acquire against Borrower or any other person obligated to pay Indebtedness arising out of the creation or performance of the Undersigned's obligation under this guaranty, including, without limitation, any right of subrogation, contribution, reimbursement, indemnification, exoneration, and any right to participate in any claim or remedy the Undersigned may have against the Borrower, collateral, or other party obligated for Borrower's debts, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law."
The guaranty agreements dated July 9, 1997, contain the following provision:
 "13. SUBROGATION. Guarantor hereby irrevocably waives and releases the Borrower from all `claims' (as defined in Section 101(5) of the Bankruptcy Code) to which Guarantor is or would, at any time, be entitled by virtue of its obligations under this Guaranty, including[,] without limitation, any right of subrogation (whether contractual, under Section 509 of the Bankruptcy Code or otherwise), reimbursement, contribution, exoneration or similar right against the Borrower, any co-guarantor, any third party or any Collateral."
The Milling Company defaulted on its loans to the Bank, and the Bank called upon each of the guarantors to satisfy the debt. The Harris-Lovell group paid the entire amount due in accordance with the guaranty agreements. The Sheltons failed to pay any amount to the Harris-Lovell group in contribution for the discharge of the common obligation.
 II. The Standard of Review
In reviewing the disposition of a motion for a summary judgment, we use the same standard used by the trial court in determining whether the evidence before it made out a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Bussey v. JohnDeere Co., 531 So.2d 860, 862 (Ala. 1988). When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to present "substantial evidence" creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794,797-98 (Ala. 1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida., 547 So.2d 870,871 (Ala. 1989). Our review is subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie,Inc., 564 So.2d 412, 413 (Ala. 1990). *Page 287 
 III. Does the Integration Rule Apply to Separate Guaranty Agreements Executed by Coguarantors?
The Harris-Lovell group first contends that a guarantor cannot waive the right to contribution by the execution of a contract between individual guarantors and the lender, in the absence of one agreement to which all of the guarantors are signatories. The Court of Civil Appeals, relying upon Kandlis v. Huotari, 678 A.2d 41 (Me. 1996), concluded that an agreement between all of the guarantors was unnecessary because the individual guaranty agreements separately executed between the Bank and each guarantor constituted one contract by which each guarantor was bound. According to the Court of Civil Appeals, because all of the guaranty agreements were executed at the same time, by the same parties, for the same purpose, and contained the same language, all of the guaranty agreements constituted an integrated agreement that should be considered and construed as one contract, waiving the right to contribution among the guarantors.
Our research reveals that the question whether the right of contribution may be waived by separate guaranty agreements between each guarantor, the principal debtor, and the creditor is one of first impression in Alabama. In Layne v. Garner, 612 So.2d 404, 406-08 (Ala. 1992), this Court enforced the terms of a single guaranty agreement signed by multiple guarantors prohibiting the guarantors from seeking contribution from each other "until all of the indebtedness shall have been fully paid and discharged." The result reached in Layne clearly recognizes that a guarantor's right to contribution may be affected by the terms of the guaranty agreement that he or she, along with the other guarantors, signed.
Other jurisdictions have recognized the general rule that the right to contribution can be destroyed only by an agreement between the obligated parties. See Kandlis, 678 A.2d at 42-43, United States v. Immordino,534 F.2d 1378, 1382 (10th Cir. 1976); see also 18 Am. Jur.2dContribution §§ 4, 27, 33 (1985). The Supreme Judicial Court of Maine has recognized an exception to this rule when separate guaranty agreements can be read together as a single contract under the theory of integration. Kandlis, 678 A.2d at 43.
In Kandlis, Keiser Homes sought financing from Oxford Bank and Trust. 678 A.2d at 42. As a condition of the loan, the Bank required that all the shareholders of Keiser and their spouses sign identical personal guaranty agreements for the full amount of the loan. Keiser subsequently defaulted on the loan. The Bank brought several actions seeking judgments against the guarantors. One of the guarantors, Kandlis, paid the Bank $375,000, an amount in excess of his pro rata share of the debt. Kandlis filed a cross-complaint against the other guarantors for contribution.Id.
The defendant coguarantors argued that by the express language in the guaranty agreements Kandlis had waived his right to seek contribution from the coguarantors. Id. Recognizing the general rule that the right of contribution can be destroyed only by an agreement between the obligated parties, the Court held that even if the relevant language of a guaranty agreement contains an express waiver of the guarantors' rights to contribution, the waiver is enforceable by one guarantor against another only if the separate guaranty agreements can be read together as a single contract. Id. at 43. The Maine Court held that, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the *Page 288 
same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together, because they are, in the eyes of the law, one contract or instrument. Kandlis, 678 A.2d at 43. Because the guarantors signed identical guaranty agreements, for the same purpose, and all within the same period, the Court held thatif the guaranty agreements contained an express waiver of contribution, the individual agreements could be construed together to form a single contract containing an express waiver of contribution that was enforceable among and between the guarantors. Id. at 43.
We find Kandlis persuasive, and we hold that if the language of separate guaranty agreements contains an express waiver of each guarantor's right to contribution, the waiver is enforceable by one guarantor against another so long as the separate guaranty agreements can be read together as a single contract.
 IV. Should the Integration Rule Be Applied On the Facts Before Us?
The Harris-Lovell group contends that even if the integration rule permits waiver of contribution, the separate guaranty agreements the guarantors signed do not constitute an integrated agreement because those agreements were signed by different parties and because the intention of the parties was not to create an integrated agreement. Although we have stated that two or more instruments executed contemporaneously by thesame parties in reference to the same subject matter constitute one contract, this Court has not firmly held to a rule requiring that the parties be the same. See Haddox v. First Alabama Bank, 449 So.2d 1226,1229 (Ala. 1984).
In Haddox we allowed the integration of several documents, including a loan agreement, a commitment agreement, a promissory note, and a mortgage, all signed by different parties, to be construed as one contract to establish the terms of the contract. Haddox, 449 So.2d at 1229. Moreover, other jurisdictions have recognized that two or more agreements may be construed as one contract even though the parties to the agreements are not all the same, such as where some of the documents are executed by parties who have no part in executing the others,provided that the agreements in question relate to the same subjectmatter. 17A C.J.S. Contracts § 315 at 338 (1999). Each of the guaranty agreements signed by the Harris-Lovell group and the Sheltons was made for the same purpose — to secure financing for the daily operation of a restaurant that each of the guarantors participated in opening and operating.
The Harris-Lovell group also argues that even if the integration rule applies to contracts signed by different parties, the rule does not apply in this case because, it says, the threshold requirement under the general rule of integration — that there be an "absence of anything to indicate a contrary intention" — was not satisfied in this case. According to the Harris-Lovell group, the oral agreement to each be responsible for one third of any liability to the Bank that the parties entered into indicated an intent contrary to an intent to waive contribution. The Court of Civil Appeals rejected the Harris-Lovell group's argument, quoting the basic principle of contract law that "`[an oral] agreement as well as all prior negotiations merge[s] into the written contract between the parties.'" 837 So.2d at 280, quoting Leaguev. Giffin, 347 So.2d 1332, 1333 (Ala. 1977).
The general rule is that *Page 289 
 "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."
3 A. Corbin, Contracts § 573 at 357 (1960) (footnote omitted), cited in Hurst v. Nichols Research Corp., 621 So.2d 964, 966 (Ala. 1993), andHibbett Sporting Goods, Inc. v. Biernbaum, 375 So.2d 431, 434 (Ala. 1979). However, the preliminary question is whether the guaranty agreements, when construed together, are a complete and accurate integration of the agreement between the parties. These separate agreements contain no merger clause, i.e., no provision reciting that the instrument constitutes the entire agreement between the parties. Because the written document alone is insufficient, we answer this question by considering extrinsic evidence, including the conduct and language of the parties and the surrounding circumstances. See Hibbett Sporting Goods,Inc., 375 So.2d at 436. According to Professor Arthur L. Corbin, "no relevant evidence, whether parol or otherwise, is excluded" when attempting to determine whether a writing is a complete and accurate integration of the agreement of the parties. 3 A. Corbin, Contracts
§ 573 at 360. Professor Corbin also observes:
 "Proof of [the contract's] completeness and accuracy, discharging all antecedent agreements, must be made in large part by the oral testimony of parties and other witnesses. The very testimony that the `parol evidence rule' is supposed to exclude is frequently, if not always, necessary before the court can determine that the parties have agreed upon the writing as a complete and accurate statement of terms. The evidence that the rule seems to exclude must sometimes be heard and weighed before it can be excluded by the rule."
3 A. Corbin, Contracts § 582 at 449-50 (footnotes omitted). According to Corbin, a trial court can receive parol evidence of the alleged negotiations leading to a written agreement only on the question whether the offered writing was mutually assented to as a complete integration. "[I]f, in spite of the received testimony, the court finds that the writing was mutually assented to as a complete integration, it thereby finds that the negotiations testified to were discharged and nullified by the parties themselves." 3 A. Corbin, Contracts § 582 at 450, n. 80; see also Wigmore, Evidence § 2430(2) at 98-99 (1981); Hurst, 621 So.2d at 967; Hibbett Sporting Goods, Inc., 375 So.2d at 436.
Thus, the Court of Civil Appeals erred in affirming the trial court's summary judgment and refusing to consider the alleged oral agreement the parties entered into before signing the written guaranty agreements and any other relevant evidence concerning the conduct of the parties or the circumstances surrounding the execution of the agreements. Such evidence should be considered in initially determining whether the guaranty agreements constituted a complete and accurate integration of the agreement between the parties. If the evidence indicates that the separately executed guaranty agreements were intended to constitute the complete and accurate integration of the agreement between the parties, antecedent oral agreements between the parties may not be used to contradict the terms of the guaranty agreements. On the other hand, if the evidence establishes that antecedent oral agreements existed and that the parties did not intend for the execution of *Page 290 
multiple separate guaranty agreements to replace the antecedent oral agreements and thereby become the final understanding between the coguarantors on the subject of contribution, then the rights as between the coguarantors cannot be defeated by provisions in the separately executed guaranty agreements.
 IV. Even if the Integration Rule Applies, Does the Waiver Provision in the July 9, 1997, Guaranty Agreements Unambiguously Defeat the Right of Contribution Between Coguarantors?
The Harris-Lovell group also contends that the waiver-of-contribution provision in the guaranty agreements dated July 9, 1997, is ambiguous, making the waiver of contribution a question for the trier of fact. No contention of ambiguity is asserted as to the other four guaranty agreements. The guaranty agreements dated July 9, 1997, contain the following provision:
 "13. SUBROGATION. Guarantor hereby irrevocably waives and releases the Borrower from all `claims' (as defined in Section 101(5) of the Bankruptcy Code) to which the Guarantor is or would, at any time, be entitled by virtue of its obligations under this Guaranty, including[,] without limitation, any right of subrogation (whether contractual, under Section 509 of the Bankruptcy Code or otherwise), reimbursement, contribution, exoneration or similar right against the Borrower, any co-guarantor, any third party or any Collateral."
The Harris-Lovell group argues that the waiver is intended to apply only to the "Borrower" and not to the guarantors. According to the Harris-Lovell group, the first clause in the provision ends in a comma following the word "Guaranty" and the second clause of the provision is set off only to define what "claims" the guarantor might have against the borrower. The Harris-Lovell group argues that if this provision was intended to waive all claims against coguarantors the provision would have read, "Guarantor hereby irrevocably waives and releases the Borrowerand any Coguarantor from any `claims. . . .'"
Whether a contract is ambiguous is a question of law for the court to determine. Haddox, 449 So.2d at 1228. When the terms of a contract are clear and certain, it is the duty of the court, not the jury, to analyze the contract and determine the meaning of the contract. Palmer v. PerryCounty Bd. of Educ., 496 So.2d 2, 5 (Ala. 1986). However, once a court determines that an instrument is ambiguous or uncertain in any respect, it becomes a question for the factfinder to determine the true meaning of the contract. Shadrick v. Johnston, 571 So.2d 1008, 1013 (Ala. 1990). Ambiguity exists when a term is reasonably susceptible to more than one interpretation. Cannon v. State Farm Mut. Auto. Ins. Co., 590 So.2d 191,194 (Ala. 1991). If a court determines that a contract is ambiguous, extrinsic evidence will be allowed to clarify the contract. Poole v.Henderson, Black Greene, Inc., 584 So.2d 485, 487 (Ala. 1991).
After careful examination of the July 9, 1997, guaranty agreements, we must agree that the "waiver" provision contained in section 13 of those agreements is ambiguous. The first clause of the provision seeks to waive and release only the claims the guarantor would have against the borrower. Compare the language in the other guaranty agreements signed by the Harris-Lovell group and the Sheltons ("The Undersigned waives any claim, remedy or other right . . . against the Borrower or any otherperson obligated to pay Indebtedness. . . .") (emphasis added). The last clause of the provision in the July 9, 1997, guaranty agreements, however, purports to waive claims against any *Page 291 
coguarantor. Section 13 of the guaranty agreements is susceptible to more than one interpretation; therefore, we must remand this cause to the trial court for the factfinder to determine the meaning of the provision.
 V. Conclusion
For the reasons discussed above, the judgment of the Court of Civil Appeals is reversed and the case is remanded to that court. That court is to remand the case to the trial court for that court to determine whether the guaranty agreements constituted a complete and accurate integration of the agreement between the parties, based upon the conduct and language of the parties and the circumstances surrounding the agreement. If the guaranty agreements did not constitute a complete and accurate integration of the contract, the Harris-Lovell group is entitled to contribution from the Sheltons. On the other hand, if the guaranty agreements constituted one integrated agreement between the parties, the factfinder must then, and only then, construe section 13 of the July 9, 1997, guaranty agreements in order to determine whether it acts as a waiver of the guarantor's right to seek contribution from the other coguarantors. If it does, the Harris-Lovell group would not be entitled to contribution from the Sheltons. If it does not, the Harris-Lovell group would be entitled to seek contribution from the Sheltons only for the amount of the loan guaranteed by the July 9, 1997, agreements.
REVERSED AND REMANDED WITH DIRECTIONS.
Moore, C.J., and Houston, See, Brown, Johnstone, Harwood, Woodall, and Stuart, JJ., concur.